HANSEN, Circuit Judge.
In this case, we are asked to decide whether an American Indian Tribal Court has subject matter jurisdiction over a tort case which arose out of an automobile accident which occurred between two non-Indian parties on an Indian reservation. A divided panel of this court previously concluded that the Indian tribe retained the inherent sovereign power to allow the tribal court to exercise subject matter jurisdiction over the dispute. After granting the suggestion of A-l Contractors and Lyle Stoekert to rehear this case en banc, we vacated the panel opinion. We now hold that the tribal court does not have subject matter jurisdiction over the dispute.
I.
On November 9, 1990, on a state highway on the Fort Berthold Indian Reservation in west-central North Dakota, a gravel truck owned by A-l Contractors and driven by Lyle Stoekert (an A-l employee) and a small car driven by Gisela Fredericks collided. Mrs. Fredericks suffered serious injuries and was hospitalized for 24 days. A-l is a non-tribal company located in Dickinson, North Dakota. Stoekert is not a member of the tribe and resides in Dickinson, North Dakota. Mrs. Fredericks is not a member of the tribe; however, she resides on the reservation, she was married to a tribal member (now deceased), and her adult children are enrolled members of the tribe.
At the time of the accident, A-l was working on the reservation under a subcontract agreement with LCM Corporation, a corporation wholly owned by the tribe. Under the subcontract, A-l performed excavating, berming, and recompacting work in connection with the construction of a tribal community budding. A-l performed all of the work under the subcontract within the boundaries of the reservation. The record is not clear whether Stoekert was engaged in work under the contract at the time of the accident.[1]
*933 In May 1991, Mrs. Fredericks sued A-l, Stockert, and Continental Western Insurance Company (A-l’s insurer), in the Tribal Court for the Three Affiliated Tribes[2] of the Fort Berthold Indian Reservation. Mrs. Freder-icks’ adult children also filed loss of consortium claims as part of the suit. Mrs. Freder-icks and her adult children sought damages in excess of $18 million for personal injury, loss of consortium, and medical expenses.
A-l, Stockert, and Continental Western made a special appearance in tribal court and moved to dismiss the Frederickses’ suit, contending that the tribal court lacked personal and subject matter jurisdiction. The tribal court denied the motion and found that it had personal and subject matter jurisdiction over the suit brought by Gisela Fredericks. Fredericks v. Continental Western Ins. Co., No. 5-91-A04-150, slip op at 1.24(d) (Fort Bert-hold Tribal Ct. Sept. 4, 1991). Specifically, the tribal court found that it had personal jurisdiction over the parties based on Chapter 1, section 3 of the Tribal Code because Mrs. Fredericks is a resident of the reservation and because A-l had “entered and transacted business within the territorial boundaries of the Reservation.” Id. at 1.24(c). The tribal court also concluded that it had subject matter jurisdiction over the action because its inherent tribal sovereignty had not been limited by treaty or federal statute. See id. at 1.24(d). Given the tribal court’s conclusion that it had jurisdiction over the claims of Gisela Fredericks, the tribal court did not reach the question of its jurisdiction over the consortium claims brought by her children, who were tribal members.
A-l, Stockert, and Continental Western appealed to the Northern Plains Intertribal Court of Appeals. The Intertribal Court of Appeals affirmed the tribal court and remanded the case to the tribal court for further proceedings. Fredericks v. Continental Western Ins. Co., Northern Plains Intertribal Ct.App. (Jan. 8,1992). The Intertribal Court of Appeals took a broad view of the tribe’s civil authority over the non-Indians involved in this dispute:
Like any sovereign, Three Affiliated Tribes has [sic] an interest in providing a forum for peacefully resolving disputes that arise in their geographic jurisdiction and protecting the rights of those who are injured within such jurisdiction.
Slip op. at 7. Continental Western was dismissed from the case without prejudice pursuant to an agreement of the parties.
Before proceedings resumed in the tribal trial court, A-l and Stockert filed this case in the United States District Court for the District of North Dakota against Mrs. Fred-ericks and her children (hereinafter “the Frederickses”), the Honorable William Strate, Associate Tribal Judge for the Tribal Court of the Three Affiliated Tribes of the Fort Berthold Indian Reservation, and the tribal court itself. A-l and Stockert sought injunctive and declaratory relief. They asked the district court to declare that the tribal court had no jurisdiction over this matter, to enjoin the Frederickses from proceeding against them in the tribal court, and to enjoin the tribal judge and the tribal court (hereinafter the “tribal defendants”) from asserting jurisdiction over them.
The tribal defendants initially raised the affirmative defense of sovereign immunity, but subsequently consented to the suit for the limited purpose of defending the federal law claims for injunctive relief. Both sides filed motions for summary judgment on the issue of tribal court jurisdiction. The district court denied the summary judgment motion of A-l and Stockert, and it granted the summary judgment motions of the Frederickses and the tribal defendants. A-1 Contractors v. Strate, Civil No. A1-92-94 (D.N.D. Sept. 17, 1992). The district court decided that the only factual dispute was whether Mrs. Fredericks resided on or off *934 the reservation, which was irrelevant to the issue of tribal court jurisdiction. Id. at 4-5. The district court then decided that the tribal court had both personal and subject matter jurisdiction, and concluded that Indian tribes have retained inherent sovereignty to exercise jurisdiction over civil causes of action between non-Indians that arise on the reservation unless specifically limited by treaty or federal statute. Id. at 9-10. The district court found that there was no treaty or statute that limited the tribe’s jurisdiction in this case. Id. at 10. A-1 and Stockert appealed on the issue of subject matter jurisdiction over the claims of Mrs. Fredericks.[3]
A panel of this court affirmed the district court in a two-to-one decision. A-1 Contractors v. Strate, No. 92-3359, 1994 WL 666051 (8th Cir. Nov. 29, 1994). A-l and Stockert requested review of the panel’s decision en banc. We granted their request, vacated the panel .opinion, and set this case for rehearing en banc.
II.
We review de novo the district court’s decision both granting and denying summary judgment. Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir.1992). We agree with the district court that this case presents no relevant factual disputes for our review. The only question presented, whether the tribal court has jurisdiction over this dispute, is a question of law. FMC v. Shoshone-Bannock Tribes, 905 F.2d 1311, 1313-14 (9th Cir.1990), cert. denied, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991).
The specific question presented for our resolution is whether the tribal court has civil jurisdiction over this dispute which arose between two non-Indian parties on the Fort Berthold Reservation. A-l and Stockert argue that under Supreme Court case law, the tribe does not have the inherent sovereign authority to exercise civil jurisdiction over non-Indians unless the dispute implicates an important tribal interest. See, e.g., Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); South Dakota v. Bourland, 508 U.S. 679, 695-97, 113 S.Ct. 2309, 2320, 124 L.Ed.2d 606 (1993); Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation, 492 U.S. 408, 426-27, 109 S.Ct. 2994, 3005-06, 106 L.Ed.2d 343 (1989) (plurality). A-l and Stockert argue that because this case involves no such tribal interest, the district court erred in holding that the tribal court had subject matter jurisdiction over this dispute. The Frederickses and the tribal defendants (collectively “the appellees”) argue that a different line of Supreme Court authority governs this issue. The appellees argue that language from this line of cases indicates that the district court correctly concluded that tribal courts have inherent civil jurisdictional authority over all disputes arising on the reservation, regardless of whether the parties involved are tribal members. See, e.g., Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987); National Farmers Union Ins. Cos v. Crow Tribe of Indians, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985); Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 137, 102 S.Ct. 894, 901-02, 71 L.Ed.2d 21 (1982); Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). The appel-lees contend that the district court correctly found that the tribe had full geographical/territorial jurisdiction over this dispute. The issue presented for our review is largely unresolved and has generated a great deal of interest and commentary. See, e.g., Allison S. Dussias, Geographically-Based and Membership-Based Views of Indian Tribal Sovereignty: The Supreme Court’s Changing Vision, 55 U.Pitt.L.Rev. 1 (1993) (detailing and criticizing the Supreme Court’s increasing emphasis on membership-based sovereignty).
In our view, the standards articulated in Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), and subsequent cases applying those standards, control the resolution of this dispute. In Montana, the Supreme Court specifically addressed the reach of tribal civil jurisdiction over non-Indian parties and found that:
*935 the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.
Id. at 564, 101 S.Ct. at 1257-58 (citations omitted). The Court then announced the general principle that “the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.” Id. at 565, 101 S.Ct. at 1258.[4]
Indian tribes, however, do “retain inherent sovereign authority to exercise some forms of civil jurisdiction over non-Indians on their reservations.” Id. (emphasis added). This jurisdiction arises: (1) when nonmembers “enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements” or (2) when a nonmember’s “conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.” Id. at 565-66, 101 S.Ct. at 1258 (citations omitted). These two situations are the “two exceptions” to Montana’s general rule that an Indian tribe does not have inherent sovereign powers over the activities of nonmembers. Bourland, 508 U.S. at 695-97, 113 S.Ct. at 2320. In our view, the tribal court in this ease would not have subject matter jurisdiction under Montana unless the appellees can establish the existence of a tribal interest under either of the two exceptions.
The Supreme Court has reiterated or reaffirmed the Montana analysis of civil tribal jurisdiction over non-Indians a number of times. Bourland, 508 U.S. at 693-95, 113 S.Ct. at 2319 (reasserting the centrality of the observation in Montana that “exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal tribal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation”); County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation, 502 U.S. 251, 267, 112 S.Ct. 683, 692-93, 116 L.Ed.2d 687 (1992) (citing Montana in referring to the “long line of cases exploring the very narrow powers reserved to tribes over the conduct of non-Indians within their reservations”); Duro v. Reina, 495 U.S. 676, 687-88, 110 S.Ct. 2053, 2060-61, 109 L.Ed.2d 693 (1990) (criminal jurisdiction case reciting Montana’s observation that “the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe” and that civil tribal jurisdiction over non-Indians on the reservation typically involves situations arising from property ownership within the reservation or the “consensual relationships” outlined in Montana), overruled by statute on other grounds, 25 U.S.C. § 1301(2) & (3); Brendale, 492 U.S. at 426-27, 109 S.Ct. at 3005-06 (plurality) (following Montana principles and concluding there was no tribal interest which allowed the tribe to exercise authority over nonmembers on fee lands within the reservation). Perhaps the Court’s most emphatic reiteration of these standards is its recent statement that “after Montana, tribal sovereignty over nonmembers ‘cannot survive without express congressional delegation.’” Bourland, 508 U.S. at 695 n. 15, 113 S.Ct. at 2320 n. 15.
The appellees argue that instead of applying the Montana analysis, we should resolve this case under the Supreme Court’s decisions in Iowa Mutual, National Farmers Union, Williams v. Lee, and Merrion. In our view, none of those cases supports the appellees’ contentions that the tribal court has the broad civil subject matter jurisdiction the tribal courts and the district court found in this ease. In Iowa Mutual, the Court held only that exhaustion of tribal remedies is required before a federal district court can decide the issue of federal court jurisdiction. *936 480 U.S. at 18-19, 107 S.Ct. at 977-78; see also Brendale, 492 U.S. at 427 n. 10, 109 S.Ct. at 3006 n. 10 (the plurality specifically observed that Iowa Mutual only established an exhaustion rule and did not decide whether the tribe had jurisdiction over the nonmembers involved). In reaching its conclusion on the exhaustion requirement, the Court offered the following observation upon which the appellees rely heavily:
Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. See Montana v. United States, 450 U.S. 544, 565-66, 101 S.Ct. 1245, 1258-59, 67 L.Ed.2d 493 (1981) [other citations omitted]. Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute.
Iowa Mutual, 480 U.S. at 18, 107 S.Ct. at 977. The appellees argue that this language indicates that Indian tribes retain unrestricted territorial civil jurisdiction unless that jurisdiction has been affirmatively limited by treaty or federal statute. The appellees contend that like a state, the tribe retains full sovereignty over all matters arising on the reservation unless and until that jurisdiction is divested by federal law. The appellees further argue that consistent with Iowa Mutual, the tribal court may exercise subject matter jurisdiction in this ease because it happened on the reservation and there has been no affirmative divestment of the tribe’s authority.
In our view, the appellees’ reading of this isolated language from Iowa Mutual is unnecessarily broad and conflicts with the principles of Montana. This language from Iowa Mutual can and should be read more narrowly and in harmony with the principles set forth in Montana, which the Court cites in making those observations. When the Court observes in Iowa Mutual that “[t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty,” 480 U.S. at 18, 107 S.Ct. at 977, the Court cites Montana and thus is referring to the types of activities, like consensual contractual relationships (the first Montana exception), that give rise to tribal authority over non-Indians under Montana Likewise, when the Court goes on to say “[c]ivil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute,” id. (emphasis added), the Court again is referring to a tribe’s civil jurisdiction over tribal-based activities that exists under Montana. We recently interpreted the Iowa Mutual case in just such a fashion, stating: “Civil jurisdiction over tribal-related activities on reservations presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or by federal statute.” Duncan Energy v. Three Affiliated Tribes, 27 F.3d 1294, 1299 (8th Cir.1994) (emphasis added) (citing Iowa Mutual, 480 U.S. at 18, 107 S.Ct. at 977-78). Hence, Iowa Mutual should not be read to expand the category of activities which Montana described as giving rise to tribal jurisdiction over non-Indians or nonmembers. Instead, we read it within the parameters of Montana.
National Farmers Union, like Iowa Mutual, was an exhaustion case which did not decide whether tribes had jurisdiction over nonmembers. Brendale, 492 U.S. at 427, 109 S.Ct. at 3006 n. 10. Nonetheless, the appel-lees contend that we should read National Farmers Union as a limitation on the reach of Montana because National Farmers Union limited the reach of Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), a criminal tribal jurisdiction case upon which Montana relied. In Oliphant, the Court had concluded that tribal courts have no criminal jurisdiction over non-Indians because the tribe did not retain the inherent authority to exercise that type of jurisdiction. 435 U.S. at 208-10, 98 S.Ct. at 1020-22. The Court in National Farmers Union stated that “the question whether a tribal court has the power to exercise civil subject-matter jurisdiction over non-Indians in a case of this kind is not automatically foreclosed, as an extension of Oliphant would require.” 471 U.S. at 855, 105 S.Ct. at 2453. The appellees argue that in National Farmers Union the Court refused to extend Oli-phant ’s limitation of inherent sovereign authority to civil cases.
*937 The appellees fail to recognize the fact that Montana specifically extended the general principles underlying Oliphant to civil jurisdiction. Montana, 450 U.S. at 565, 101 S.Ct. at 1258 ("Though Oliphant only determined inherent tribal authority in criminal matters, the principles on which it relied support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe") (footnote omitted). Montana did not extend the full Oliphant rationale to the civil jurisdictional question-which would have completely prohibited civil jurisdiction over nonmembers. Instead, the Court found that the tribe retained some civil jurisdiction over nonmembers, which the Court went on to describe in the Montana exceptions. 450 U.S. at 565-66, 101 S.Ct. at 1258-59. Thus, when National Farmers Union states that civil tribal jurisdiction over nonmembers is not foreclosed by Oliphan4 that observation is perfectly consistent with Montana, which provides for broader tribal jurisdiction over non-Indians than does Oliphant. Under Montana, the tribe has the abifity to exercise civil jurisdiction over non-Indians when tribal interests (as defined in the Montana exceptions) are involved.
We also read the other cases the appellees rely upon within the limits of Montana. In Williams, the Court found that the tribal courts had jurisdiction over a suit by a non-Indian store owner on the reservation against two members of the tribe for breach of contract based on a transaction that occurred on the reservation. 358 U.S. at 218, 223, 79 5.Ct. at 269-70, 272. This factual situation fits squarely under the "consensual agreement" test for jurisdiction in Montana (the first Montana exception). In fact, Montana specifically cited Williams in creating the two exceptions that allow for civil jurisdiction over non-Indians. 450 U.S. at 544-45, 101 S.Ct. at 1247-48.
Similarly, the appellees read too much into language from Me'rriom, where the Court stated in a footnote: "Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence ... is that the sovereign power remains intact." 455 U.S. at 148 n. 14, 102 S.Ct. at 907 n. 14. The Court made the observation in isolation in a case dealing with the tribe's authority to impose a severance tax on non-Indians on the reservation. The Court found this taxation power was derived either from the tribe's inherent power of self-government or the power to exclude, id. at 149, 102 S.Ct. at 908, both of which are consistent with the inherent powers the tribe retains over nonmembers described in Montana. Both Me'rrion and Iowa Mutual say essentially the same thing: the inherent attributes of sovereignty that an Indian tribe retains, which under Montana are very limited when dealing with non-Indians, remain intact unless affirmatively limited by the federal government.
The appellees argue that Montana and Brendale apply only to a tribe's abifity to exercise authority over non-Indians' activities on non-Indian fee lands-i.e., plots of land owned by non-Indians in fee simple that happen to be located within the exterior boundaries of the reservation. In our view, the appellees place an artificial limitation on those cases. While Montana and Brendale address questions of tribal authority over non-Indians on non-Indian owned fee lands, neither case limits its discussion or rationale to jurisdictional issues arising on fee lands. To the contrary, the Montana Court found, without any qualification whatsoever, that tribal power may not reach beyond what is necessary to protect tribal self-government or to control hiternal relations absent express congressional delegation. 450 U.S. at 564, 101 S.Ct. at 1257-58. Montana also specifically addressed the "forms of civil jurisdiction over non-Indians on their reservations" and provided the two limited situations in which that jurisdiction may arise. Id. at 565, 101 S.Ct. at 1258 (emphasis added). Thus, Montana explicitly addressed the authority of tribes to exercise civil jurisdiction on the reservation, as well as on non-Indian fee lands. The Brendale plurality noted that Montana involved regulation of fee lands, but it did not specifically limit the Montana rationale to fee land disputes. See Brendale, 492 U.S. at 426-27, 109 S.Ct. at 3005-06. Since Brendale, the Supreme Court likewise has not seen fit to limit either *938 Montana or Brendale in the fashion the ap-pellees have suggested. Instead, the Court has discussed these cases and their observations about tribal jurisdiction in broad and unqualified language. See Bourland, 508 U.S. at 693-95, 113 S.Ct. at 2319; County of Yakima, 502 U.S. at 267, 112 S.Ct. at 692-93; Duro, 495 U.S. at 687, 110 S.Ct. at 2060-61.
Moreover, a number of cases analyzing civil jurisdictional issues in non-fee land disputes have relied upon or cited Montana. See Stock West Corp. v. Taylor, 964 F.2d 912, 918-19 (9th Cir.1992) (en banc) (quoting Montana test in non-fee land jurisdictional dispute); FMC, 905 F.2d at 1314 (citing Montana in non-fee land case as “the leading case on tribal civil jurisdiction over non-Indians”); see also Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Florida, 999 F.2d 503, 508 n. 11 (11th Cir.1993) (citing Montana in recognizing that tribal courts have power to exercise civil jurisdiction in conflicts affecting the interests of Indians on Indian lands). Thus, we conclude that any attempt to limit the rationale of Montana and Brendale to fee land jurisdictional issues is both uncompelling and unsupported by the language of those two cases.
The appellees next argue that we should read the Montana line of cases as addressing tribal regulatory power over non-Indians and the line of cases represented by Iowa Mutual as addressing tribal adjudicatory power over non-Indians. They contend that Iowa Mutual and related cases would control in this case, which is a dispute about tribal adjudicatory power. The appellees assert that drawing such a distinction would be the best way to resolve what they see as the apparent contradiction between the language from those differing lines of cases.
Again, we must disagree. While the distinction the appellees propose appears in some commentaries, see, e.g., Dussias, 55 U.Pitt.L.Rev. at 43-78, the distinction does not appear explicitly, or even implicitly, anywhere in the ease law. Montana and the cases following Montana have dealt with questions of civil tribal regulatory jurisdiction, but those cases have never suggested that their reasoning is limited solely to regulatory matters. Quite the contrary, as we have noted above, those cases have spoken about civil jurisdiction in broad and unqualified terms without any limitation of the discussion to particular aspects of civil jurisdiction. Likewise, Iowa Mutual and the other cases the appellees rely on have never suggested such a distinction. In fact, in Iowa Mutual, the Court cites Montana without any indication that Montana should be limited to regulatory jurisdiction. Iowa Mutual, 480 U.S. at 18, 107 S.Ct. at 977-78.
Moreover, any attempt to create or apply a distinction between regulatory jurisdiction and adjudicatory jurisdiction in this case would be illusory. If the tribal court tried this suit, it essentially would be acting in both an adjudicatory capacity and a regulatory capacity. At oral argument, all of the parties agreed that if the tribal court tried this case, it would have the power to decide what substantive law applies. Essentially, the tribal court would define the legal relationship and the respective duties of the parties on reservation roads and highways. Thus, while adjudicating the dispute, the tribal court also would be regulating the legal conduct of drivers on the roads and highways that traverse the reservation. Accordingly, we see no basis in this case for applying the regulatory-adjudicatory distinction the appellees have proposed.
Furthermore, even if we applied a regulatory-adjudicatory distinction, it would not change our conclusion. None of the cases, including those that the appellees argue are "adjudicatory jurisdiction" cases, have ever addressed the issue presented here-a tribal court's civil jurisdiction over an accident involving non-Indian parties. As we have demonstrated above, all of the appellees' proposed "adjudicatory" cases are consistent with the Montana case. Even if we were to treat Montana as a "regulatory" authority case, we see no reason not to apply its principles to this open question of inherent authority to exercise civil adjudicatory jurisdiction over this dispute. Thus, we see no valid basis for distinguishing or limiting Montana, as the appellees suggest.
Arguably, some of the language from Iowa Mutua4 Williams, and Merrion *939 can be viewed in isolation to create tension with Montana. A careful reading of the particular language of those cases, however, indicates that they can and should be read together with Montana to establish one comprehensive and integrated rule: a valid tribal interest must be at issue before a tribal court may exercise civil jurisdiction over a non-Indian or nonmember, but once the tribal interest is established, a presumption arises that tribal courts have jurisdiction over the non-Indian or nonmember unless that jurisdiction is affirmatively limited by federal law. This rule is supported by the above authority and by the leading treatise on American Indian law, which specifically states: “Tribal courts probably lack jurisdiction over civil eases involving only non-Indians in most situations, since it would be difficult to establish any direct impact on Indians or their property.” Felix S. Cohen’s Handbook of Federal Indian Law, 342-43 (1982 ed.). This well-accepted rule controls this case.
Finally, the appellees urge us to follow a recent decision in a case factually very similar to this case, where the Ninth Circuit held that the tribal court had jurisdiction over the lawsuit. See Hinshaw v. Mahler, 42 F.3d 1178 (9th Cir.1994). In Hinshaw, Christian Mahler died from injuries he received when a car driven by Lynette Hinshaw collided with the motorcycle Mahler was riding on a U.S. highway within the boundaries of the Flathead Indian Reservation. Both Mahler and Hinshaw were residents of the reservation, but they were not members of the tribe. Id. at 1180. Mahler’s mother (an enrolled member of the tribe) and Mahler’s father (a nonmember) brought wrongful death and surviv-orship actions in the tribal court. Hinshaw challenged the tribal court’s personal and subject matter jurisdiction in federal district court. The Ninth Circuit affirmed the district court’s conclusion that the tribal court had jurisdiction over those claims. Id. at 1180-81. To the extent that Hinshaw supports the appellees’ arguments that tribal courts have jurisdiction over a tort claim arising between two non-Indians on a highway running through an Indian reservation, we respectfully decline to follow it. Such a broad interpretation of civil tribal jurisdiction is, we believe, inconsistent with Montana.
The authority is quite clear that the kind of sovereignty the American Indian tribes retain is a limited sovereignty, and thus the exercise of authority over nonmembers of the tribe “is necessarily inconsistent with a tribe’s dependent status.” Brendale, 492 U.S. at 427, 109 S.Ct. at 3006 (citing United States v. Wheeler, 435 U.S. 313, 326, 98 S.Ct. 1079, 1087-88, 55 L.Ed.2d 303 (1978)). Stated another way, “the inherent sovereign powers do not extend to the activities of nonmembers of the tribe.” Montana, 450 U.S. at 565, 101 S.Ct. at 1258, quoted in Duro v. Reina, 495 U.S. at 687, 110 S.Ct. at 2060-66. As such, we cannot endorse the appellees’ concept of plenary tribal territorial (or geographical) civil jurisdiction. Such a concept presents an overly broad interpretation of the tribe’s sovereignty which is inconsistent with the tribe’s dependent status and is contrary to Montana Thus, for the tribe to exercise civil jurisdiction over nonmembers, the Montana exceptions must be satisfied because the “inherent attributes of sovereignty” do not extend to nonmembers.
While the tribe’s inherent authority to assert civil jurisdiction over a nonmember depends on the existence of a tribal interest as defined in Montana, that does not mean geography plays no role in the sovereignty and jurisdictional inquiry. “The Court has repeatedly emphasized that there is a significant geographical component to tribal sovereignty.” White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 151, 100 S.Ct. 2578, 2587-88, 65 L.Ed.2d 665 (1980). In Montana, the Court accounted for this geographical component of the jurisdictional analysis when it stated that “Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.” 450 U.S. at 565, 101 S.Ct. at 1258 (emphasis added). Montana implicitly recognizes that without the geographic connection to Indian country, the tribes would have no plausible grounds for asserting jurisdiction over the non-Indian parties. Thus, properly understood, the geographical component of the jurisdictional analysis is impor *940 tant but not dispositive. See generally Bracker, 448 U.S. at 151, 100 S.Ct. at 2587-88 (geographical component of tribal sovereignty is important-though not dlispositive factor for courts to weigh in determthing whether a state's authority to tax non-Indi-aus for activities on reservation has been pre-empted).
IlL
Applying Montana to this case, there must be a tribal interest at issue (as defined in the Montana exceptions) before the tribal court can exercise jurisdiction over the non-Indian parties. We conclude that no such tribal interest exists in this case. This dispute arose between two non-Indians involved in an ordinary run-of-the-mill automobile accident that occurred on a North Dakota state highway traversing the reservation. Those facts, which stand alone in this case, make this dispute distinctively non-tribal in nature.
The appeilees argue that the "consensual relationship" test (the first Montana exception) is satisfied because A-i voluntarily entered into a subcontract with the tribe and Lyle Stockert was an A-i employee who was allegedly on the reservation pursuant to that subcontract when he was involved in the accident with Gisela Fredericks. In our view, that reasoning is flawed. The dispute in this case is a simple personal injury tort claim arising from an automobile accident, not a dispute arising under the terms of, out of, or within the ambit of the "consensual agreement," i.e., the subcontract between the tribes and A-i. Gisela Fredericks was not a party to the subcontract, and the tribes were strangers to the accident.[5]
The appe]lees also argue that the second Montana exception is satisfied because the dispute arose on the reservation, and therefore, the conduct in dispute here necessarily affects the tribe's political integrity, economic security, or health or welfare. The appellees contend that the dispute affects the tribe's political integrity because it deals with the tribe's abifity to function as a fully sovereign government. We disagree. In our view, this case has nothing to do with the Indian tribe's ability to govern its own affairs under tribal laws and customs. It deals only with the conduct of non-Indians and the tribe's asserted ability to exercise plenary judicial authority over a decidedly non-tribal matter. The only governmental interest the tribe alleges is the right to act as a full sovereign to exercise full sovereign authority over events that happen within its geographical boundaries. As noted above, tribes are limited sovereigns and do not possess full sovereign powers. Thus, this desire to assert and protect excessively claimed sovereignty is not a satisfactory tribal interest within the meaning of the second Montana exception.
The appellees also argue that even though Mrs. Fredericks is a non-Indian and nonmeniber of the tribe, she is a long-time resident of the reservation and hence is an imbedded member of the community with a recognizable social and economic value to the tribal community. Thus, they argue that it is critical to provide her a tribal forum for her disputes. The simple fact that Mrs. Freder-icks is a resident of the reservation, however, does not satisfy the second Montana exception. It is not essential to the tribe's political integrity, economic security, or health or welfare to provide her, a non-Indian and nonmember, with a judicial forum for resolution of her disputes. A forum is available to Mrs. Fredericks in the North Dakota state courts, and there is no indication that she would be prevented from asserting her claims, in full, in that forum.[6]
*941 Likewise, the fact that Mrs. Fredericks wants to bring her suit in the tribal courts does not control. Montana very clearly states that the conduct giving rise to the case must threaten or have a “direct effect on the political integrity, economic security, or health or welfare of the tribe,” not the nonmember, before the tribe can assert civil jurisdiction over nonmembers. 450 U.S. at 566, 101 S.Ct. at 1258 (emphasis added). Nor is it persuasive to us that Mrs. Freder-icks may be as close to being a member of the tribe as she could be without actually being a member. Montana is very clear that tribal membership is of critical importance. Mrs. Fredericks is neither an Indian nor a member of the tribe. The fact that Mrs. Fredericks has not been admitted to membership in the tribe places her outside the reach of the tribe’s inherent authority, absent some separate showing of a direct effect on the tribe. In this ease, the appellees have completely failed to show that the tribe’s ability to govern or protect its own members would be directly damaged if the tribe cannot assert jurisdiction over this lawsuit. Thus, the second exception to Montana does not apply.
IV.
Simply stated, this case is not about a consensual relationship with a tribe or the tribe’s ability to govern itself; it is all about the tribe’s claimed power to govern non-Indians and nonmembers of the tribe just because they enter the tribe’s territory. By remaining within the principled approach of Montana, the tribe retains the ability to govern itself because the tribal court will have jurisdiction whenever a “tribal interest” in a dispute is established. Under Iowa Mutual, where such a tribal interest exists, the jurisdiction is broad and requires an affirmative change in federal law to limit it in any way. Because we have concluded that no tribal interest as defined in Montana exists in this ease, we conclude that the tribe does not retain the inherent sovereign power to exercise subject matter jurisdiction over this dispute through its tribal court. Accordingly, we reverse the judgment of the district court.

. There is no proof (as opposed to allegations) that we can find in the record to support the *933 district court’s finding of fact that A-l was in performance of the contract at the time of the accident. The district court made its fact-findings based on the pleadings in this case, not upon the evidence.

. The Three Affiliated Tribes — Mandan, Hidatsa, and Ankara — are federally recognized Indian tribes which exercise their sovereignty under a federally approved constitution adopted pursuant to the Indian Reorganization Act of 1934, 25 U.S.C.§§ 461-479.

. The consortium claims of Mrs. Fredericks' adult children are not a part of this appeal because neither the tribal courts nor the federal district court addressed the tribal courts’ jurisdiction over those claims.

. Stated another way: "A tribe’s inherent sovereignty ... is divested to the extent it is inconsistent with the tribe’s dependent status, that is, to the extent it involves the tribe’s 'external relations.’ ” Brendale, 492 U.S. at 425-26, 109 S.Ct. at 3005 (plurality) (citing United States v. Wheeler, 435 U.S. 313, 326, 98 S.Ct. 1079, 1087-88, 55 L.Ed.2d 303 (1978)). The tribe's external relations are generally those involving nonmembers of the tribe. See id.

. There has been some discussion of the effect of 28 U.S.C. § 1360 on jurisdiction of the North Dakota state courts. That section, by its very terms, applies only to the state court's jurisdiction over actions to which Indians are parties. See also 25 U.S.C. § 1322 (similar jurisdictional provision of Indian Civil Rights Act). Because we have found that this case does not involve any Indian parties, those sections simply do not ap- *941 ply to this case. We note that even if applicable, those sections would tend to indicate that the North Dakota state courts have jurisdiction over this case. See Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, 476 U.S. 877, 106 S.Ct 2305, 90 L.Ed.2d 881 (1986) (North Dakota’s attempt to disclaim unconditional state court jurisdiction over civil claims arising in Indian country held invalid).